**FIDELITY UNION CASUALTY CO. v. CAREY et al.**

**No. 1035.**

Court of Civil Appeals of Texas. Waco.

April 9, 1931.

Rehearing Denied May 7, 1931.

See, also, 13 S.W.(2d) 993; 25 S.W.(2d) 302.

Collins & Houston, of Dallas, and Lewis M. Seay, of Groesbeck, for appellant.

O. H. Machen, of Mexia, and Mr. & Mrs. O. S. Bradley and J. E. & B. L. Bradley, all of Groesbeck, for appellees.

ALEXANDER, J.

This was an action by the Fidelity Union Casualty Company against Mose Carey and others to set aside an award of the Industrial Accident Board. The case was submitted to a jury on special issues, and the court, on the answers of the jury, entered judgment for the defendants. The plaintiff appeals.

The appellant complains of the action of the court in refusing to give an instructed verdict for the insurance company. Mose Carey was an employee of Fred Hall. Hall was a teaming contractor hauling for the public, and in connection therewith had a contract to haul swill from the city of Mexia. This was an industrial vocation and was within the terms of the Workmen's Compensation Act. Hall carried compensation insurance in the appellant company. Mose Carey was stable man or general corral boss, and it was his duty to drive up the work stock in the morning, feed and harness the teams, repair harness, etc. However, Hall was also engaged in the business of raising, feeding, and shipping hogs which was a farming industry for which he could not and did not carry workmen's compensation. Gordon v. Buster, 113 Tex. 382, 257 S. W. 220. In addition to doing the work above mentioned, Carey hauled the swill from the city of Mexia and fed it to the hogs, and sometimes fed grain to the hogs, and from time to time assisted in shipping the hogs.

Appellant's first contention is that the evidence does not sufficiently show in which of these occupations appellee was engaged at the time of his injury. The evidence shows that appellee used two small horses in hauling the swill from the city of Mexia with which the hogs were fed. All of the work stock was kept in a pasture consisting of about 123 acres. At the time Carey was injured he had gone to the pasture for the purpose of corralling the work stock or at least some of them. He was riding one of the small horses used in hauling swill. While attempting to drive one or more of the horses to the barn, he was thrown, and as a result he was totally and permanently injured. There was no evidence as to which of the horses Carey was after at the time of the injury nor for what specific purpose the horse was to be used after he had been driven to the corral. Appellant insists that, since Carey was riding one of the small horses used in hauling swill, and since he was after only one other horse, we must infer that he was after the other horse usually used in hauling swill, and that the horses were being corralled for the purpose of hauling swill; and, since the swill was to be used in feeding the hogs, he was not engaged in an insurable occupation at the time of the injury. We do not think that the evidence would justify this court in drawing the many inferences contended for by the appellant, as this would clearly be the pyramiding of one presumption on another. Missouri Pac. Ry. Co. v. Porter, 73 Tex. 307, 11 S. W. 324; Fort Worth Belt Ry. Co. v. Jones, 106 Tex. 345, 166 S. W. 1130. Moreover, if we were to draw such inferences, it would not necessarily result that Carey was engaged in the noninsurable occupation at the time of the injury. Hall, the employer, testified that he had a sanitary contract with the city of Mexia to haul the swill from the city. If we should be authorized to draw the inference that the horses were being corralled for the purpose of hauling swill, Carey in performing such service would have been engaged in the performance of the contract between Hall and the city of Mexia, and therefore would have been engaged in the industrial occupation for which the insurance was carried. The mere fact that the swill was to be thrown into the hog pen after it was removed from the city would not change Carey's occupation from an insurable to a noninsurable occupation. The evidence was not sufficient to raise the inference that, at the time he was injured, he was doing anything even remotely connected with the hog raising enterprise. He was employed as corral boss. As corral boss it was his duty to round up, feed, and harness the horses. This he was doing at the time of the injury. The

jury found, in answer to special issue No. 1, that he was injured while in the due course of his employment.

■■ If the appellant had thought there was sufficient evidence to raise the inference that Carey was engaged in the hog-raising enterprise at the time of the injury, it should have requested an issue submitting the question to the jury, and allowed the jury to draw the inference. No such issue was requested and no objection made to the issue as submitted. Since the trial court rendered judgment for the appellees, it will be presumed that the court found that Carey was injured while he was engaged in the industrial occupation for which the insurance was carried. Embrey v. Ligon & Co., 118 Tex. 124, 12 S.W.(2d) 106; Fidelity & Deposit Co. v. Kelsay Lumber Co. (Tex. Com. App.) 29 S.W.(2d) 1052; Texas Employers' Ins. Ass'n v. Russell (Tex. Civ. App.) 16 S.W.(2d) 321, par. 3.

■ Appellant's second contention is that the evidence does not sufficiently show the average weekly wage of the injured employee. The appellee alleged that he earned $3 per day, and that his average weekly wage was $18 per week, working 6 days per week, and that his average annual wage was $936. The jury found that his average daily wage was $3 per day and his average weekly wage was $18 per week. The court applied Revised Statutes, article 8309, § 1, subsection 1, and arrived at the average weekly wage by multiplying the $3 per day by three hundred days and dividing this sum by fifty-two weeks. The result was $17.30 per week. The court based the recovery on 60 per cent. of this amount. The evidence shows that Carey had worked for Hall for approximately four years in substantially the same employment. He sometimes drew $15 per week and in boom time $20 per week. At the time of the injury he was working six days per week and was drawing $3 per day, or $18 per week. He generally drew $3 per day and worked six or seven days per week. The evidence does not show how many days he worked during the preceding year nor the total amount received by him for his work. There is no evidence that he lost any time. Carey was an illiterate negro and was unable to calculate the total sum received by him for his year's work. Hall, the employer, kept a record showing the amount paid Carey, but could not produce the record on the trial and could not tell the total amount paid by him during the preceding year. Appellant contends that, since Carey had worked a full calendar year in the employment in which he was injured, he had not, in the language of the statute, worked in the same employment "substantially the whole of the year immediately preceding the injury," and the court was not authorized to calculate the average weekly wage on the basis outlined in section 1, subsection 1, article 8309. He contends that the only method that could have been used was to take the total of the earnings for the year and divide this sum by fifty-two, and that there was no evidence showing the total earnings for the year. It is true that, where an employee has worked more than three hundred days during the calendar year in the same employment, he is not bound by the provisions of section 1, subsection 1, article 8309, but is entitled to have the whole of the wages received by him during the year divided by fifty-two in order to arrive at the average weekly wage. Texas Employers' Ins. Ass'n v. Storey (Tex. Com. App.) 17 S.W.(2d) 458; Petroleum Casualty Co. v. Williams (Tex. Com. App.) 15 S.W.(2d) 553. However, if either party was injured by the method used by the court in this case, it was the employee and not the insurer, and the insurer therefore has no right to complain. Hartford Accident & Indemnity Co. v. Durham (Tex. Civ. App.) 222 S. W. 275; Lumbermen's Reciprocal Ass'n v. Warner (Tex. Com. App.) 245 S. W. 664; Fidelity Union Casualty Co. v. Cary (Tex. Civ. App.) 13 S.W.(2d) 993; Casualty Reciprocal Ins. Co. v. Stephens (Tex. Civ. App.) 25 S.W.(2d) 180. The evidence shows that Carey worked from six to seven days per week. He worked regularly and generally received $3 per day, sometimes more. He sometimes worked overtime and was paid extra. There is no evidence that he lost any time. If his actual earnings for the year had been divided by fifty-two, his weekly wage would doubtless have been more than that allowed by the court. The jury found his average daily wage was $3 per day and his average weekly wage was $18 per week, and the evidence supports the verdict.

■ Appellant further contends that the $3 per day paid to Carey was for the services rendered by him indiscriminately both as corral boss in the hauling business for which insurance was carried, and for his services in feeding and rearing hogs for which insurance was not and could not be carried, and that therefore the evidence does not show what wage was earned by Carey in the industrial or insurable occupation. We have found no Texas case that has undertaken to decide how the weekly wage should be apportioned or determined where the employee immediately preceding and at the time of the injury was engaged in the service of two different employers or in two different occupations. In some states, where the employee is regularly engaged in two different occupations or is working for two different employers in the same line of work, the courts hold that the employee is entitled to establish the total sum received by him from all his concurrent employers as his average weekly wage. Juan's Case, 125 Me. 361, 134

A. 161; Anderson v. Roberts-Karp Hotel Co., 171 Minn. 402, 214 N. W. 265; Clark v. Forest Lumber Co., 9 La. App. 334, 120 So. 88; Western Metal Supply Co. v. Pillsbury, 172 Cal. 407, 153 P. 491, Ann. Cas. 1917E, 390. The holding in these cases is based on the doctrine that the insurance provided for by the statute is intended as a substitute for the lost earning capacity of the injured employee. In other states, the rule is that the compensation should be based on the wages paid by the industry in which the injured employee was working at the time of the injury and not on the actual earning of the employee in all similar work carried on by him. Quebec's Case, 247 Mass. 80, 141 N. E. 582, 30 A. L. R. 996; King's Case, 234 Mass. 137, 125 N. E. 153; Skouitchi v. Chic Cloak & Suit Co., 230 N. Y. 296, 130 N. E. 299, 15 A. L. R. 1285; Rice's Case, 229 Mass. 325, 118 N. E. 674, Ann. Cas. 1918E, 1052; Marvin's Case, 234 Mass. 145, 125 N. E. 154; Hight v. York. Mfg. Co., 116 Me. 81, 100 A. 9, L. R. A. 1917E, 277; Snow's Case, 252 Mass. 426, 147 N. E. 877; Kapler v. Camp Taghconic, 215 App. Div. 51, 213 N. Y. S. 160; Walton v. Electric Service Co., 121 Kan. 480, 247 P. 846. King's Case, supra, illustrates the holding in these cases. King worked for the Atlantic Printing Company regularly from Monday until Saturday at noon and received $28 per week. For more than a year he had worked each Saturday night for the Globe Newspaper Company at $9.20 for each Saturday night's work. He was totally disabled while in the service of the Globe Newspaper Company, and the court held that his average weekly wage was $9.20, that being the amount paid by the employer in whose service he was injured, and that the court could not take into consideration the compensation received by him from the Atlantic Printing Company. The holding in these cases is based on the doctrine that the insurance carried by the employer is a tax on the industry and is a part of the costs of production, and that the basic principle of the Workmen's Compensation Act is that the costs of injuries incidental to the modern industry should be treated as a part of the cost of the production, and that the act was framed with that end in view. Quebec's Case, 247 Mass. 80, 141 N. E. 582, 30 A. L. R. 996.

It should be noted, however, that in the state of Massachusetts, and probably in some of the other states in which the above cases were reported, there is no provision in the Workmen's Compensation Act allowing concurrent contracts of service with two or more employers, and in that state, in order to base the average weekly wage on the amount earned, the wage must have been earned by one in the same grade, employed at the same work, and of the same employer. King's Case, 234 Mass. 137, 125 N. E. 153. Our statute, article 8309, § 1, subsec. 1, reads as follows: "If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same employer or not, substantially the whole of the year immediately preceding the injury, his average annual wages shall consist of three hundred times the average daily wage or salary which he shall have earned in such employment during the days when so employed." This statute is broad enough to permit the use of the wages earned from other employers during the calendar year in determining the average weekly wage, so long as the service has been rendered in the same or similar employment, that is, in the same or similar class or grade of work, whether for the same employer or not. For the same reason we think the service could be rendered for the same employer, but in two different enterprises or industries operated by the same manager. Here the employee, if we accept appellant's contention as true, labored concurrently in two different enterprises under the same ownership. He fed and harnessed horses in one enterprise and fed hogs in the other. There was no essential difference in the grade of work done in the one from that done in the other. Moreover, the service rendered by the employee in feeding hogs in the farming enterprise was only incidental to his main employment as corral boss in connection with the hauling business. His main or dominant employment was that of corral boss. The undisputed evidence shows that he was employed for that work and was paid $3 per day "as corral boss." The fact that he sometimes fed grain to the hogs or assisted in hauling the hogs to the market was merely incidental to his main employment. During the time he was thus engaged in the farming enterprise, the insurance company was relieved from liability and was therefore benefited instead of being injured thereby.

Finding no error in the judgment of the trial court, the same is affirmed.